1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**KESSLER TOPAZ**
 **MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Counsel for Plaintiff Deneen Nock and
the Proposed Classes*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

DENEEN NOCK, Individually and on Behalf All Others Similarly Situated,

Plaintiff,

v.

HONDA MOTOR COMPANY LIMITED, a Japanese Corporation, and AMERICAN HONDA MOTOR CO., INC., a California Corporation,

Defendants.

Case No. 2:23-cv-00109

**CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE, AND EQUITABLE RELIEF FOR:**

1. **BREACH OF EXPRESS WARRANTY**
2. **MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301)**
3. **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
4. **FRAUDULENT CONCEALMENT**
5. **NEGLIGENT MISREPRESENTATION**
6. **UNJUST ENRICHMENT**
7. **NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (N.C. GEN. STAT. § 75-1.1)**

**JURY TRIAL DEMANDED**

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ................................................................................ 1

II.  THE PARTIES .................................................................................. 4

    A.   Plaintiff.................................................................................... 4

    B.   Defendants ............................................................................... 5

III. JURISDICTION AND VENUE ......................................................... 6

IV.  FACTUAL ALLEGATIONS ............................................................. 7

    C.   The AIS Defect ........................................................................ 7

    D.   Defendants Touted Quality, Reliability, and Safety in
        Their Marketing and Advertising .............................................. 8

    E.   Defendants' Knowledge of the Defect and Associated Safety Risk ...... 11

V.   TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL .......... 25

VI.  CLASS ACTION ALLEGATIONS ................................................. 25

VII. CLAIMS FOR RELIEF ................................................................... 29

COUNT I Breach of Express Warranty
    (On behalf of the Nationwide Class and the North Carolina Sub-Class)........... 29

COUNT II Violation of the Magnuson-Moss Warranty Act ("MMWA"),
15 U.S.C. § 2301, *et seq.*
    (On behalf of the Nationwide Class and the North Carolina Sub-Class)........... 32

COUNT III Breach of Implied Warranty of Merchantability
    (On behalf of the Nationwide Class and the North Carolina Sub-Class)........... 35

COUNT IV Fraudulent Concealment
    (On behalf of the Nationwide Class and the North Carolina Sub-Class)........... 37

COUNT V Negligent Misrepresentation
    (On behalf of the Nationwide Class and the North Carolina Sub-Class)........... 39

COUNT VI Unjust Enrichment
    (On behalf of the Nationwide Class and the North Carolina Sub-Class)........... 40

COUNT VII Violation of the North Carolina Unfair and Deceptive
Trade Practices Act ("UDTPA") N.C. Gen. Stat. § 75-1.1, *et seq.*
    (On behalf of the North Carolina Sub-Class)........................................ 41

VIII. PRAYER FOR RELIEF .................................................................. 44

IX.  DEMAND FOR JURY TRIAL ........................................................ 45

i

The allegations herein are based on personal knowledge as to Plaintiff's own conduct and are made on information and belief as to all other matters based on an investigation by counsel.[1]

## I. INTRODUCTION

1. Plaintiff Deneen Nock ("Plaintiff") brings this class action against Honda Motor Company, Ltd. ("HML") and American Honda Motor Company, Inc. ("AHMC" and collectively "Defendants"), individually and on behalf of all persons or entities in the United States who purchased, leased, or own a Class Vehicle (defined below), asserting claims for fraud by omission/fraudulent concealment, negligent misrepresentation, unjust enrichment, breach of express and implied warranties, violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, *et seq.*, and violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1, *et seq.* on behalf of the Classes (defined below).

2. The affected vehicles include model years 2016-2020 Honda Pilot, and model years 2015-2020 Honda Odyssey, Acura TLX, and Acura MDX vehicles designed, manufactured, marketed, distributed, sold, warranted, and/or serviced by Defendants and equipped with a 3.5L engine as well as a 9-speed automatic transmission (the "Class Vehicles").

3. The Class Vehicles are equipped with an Auto-Idle Stop ("AIS"; also referred to as "Auto Start/Stop" or "Idle Stop") that is designed to improve fuel efficiency. When engaged and functioning correctly, the AIS feature automatically shuts off the engine when the vehicle comes to a complete stop, and automatically restarts the engine when the driver releases the brake pedal, thereby reducing fuel consumption while the vehicle is stationary.

---

[1] Counsel's investigation includes an analysis of publicly available information, including consumer complaints made to the National Highway Traffic Safety Administration ("NHTSA") and additional analysis. Plaintiff believes that a reasonable opportunity for discovery will provide further support for the claims alleged herein.

1    4.    The Class Vehicles suffer from a defect that causes the AIS system to fail
2  to trigger an automatic engine restart when the driver releases the brake pedal, with the
3  AIS feature engaged. When this occurs, the Class Vehicles will, suddenly and without
4  warning, become inoperable and immobile (the "AIS Defect" or "Defect").

5    5.    The Defect has resulted in hundreds of complaints to NHTSA.

6    6.    The Defect poses significant safety risks to Plaintiff and members of the
7  Classes when the AIS fails to restart the engine, and the Class Vehicles become
8  inoperable and immobile, often in hazardous locations.

9    7.    The Defect also poses the risk that Plaintiff and members of the Classes
10  will be faced with significant costs of towing inoperable vehicles, ineffective repairs
11  and/or unnecessary replacement parts while trying to diagnose and fix the Defect in
12  their Class vehicles. Because Defendants have not developed a remedy for the AIS
13  Defect, these efforts will be futile, and the AIS system's engine restart failure will
14  recur, leading to additional service visits and more out-of-pocket costs.

15    8.    The AIS Defect is not new to Defendants. In 2018, Defendant AHMC
16  issued an internal communication to its network of authorized Service Managers and
17  Advisors, acknowledging customer complaints related to inoperative AIS systems in
18  their 2018 Honda Odyssey and 2018 Honda Pilot vehicles, and requesting to conduct
19  site visits to inspect impacted vehicles.

20    9.    Four years and hundreds of customer complaints after first notifying
21  authorized Service Managers and Advisors of the Defect, Defendants have failed to
22  issue a recall, extend the warranty of the Class Vehicles, offer effective repairs and/or
23  appropriate replacement parts, or taken any other corrective action with regard to the
24  AIS Defect in the Class Vehicles.

25    10.    The volume of consumer NHTSA complaints about the AIS failure to
26  automatically restart engines in the Class Vehicles prompted NHTSA to launch its own
27  investigation on June 3, 2022 into the AIS Defect.

28

11.     Despite having longstanding knowledge of the AIS Defect, the NHTSA complaints, and the risk of collisions when the AIS feature fails to restart the engine as expected, Defendants knowingly, actively, and affirmatively omitted and/or concealed the existence of the Defect to increase profits by selling and leasing additional Class Vehicles. Knowledge and information regarding the Defect and the associated safety risk was in the exclusive and superior possession of Defendants and their dealers, and was not provided to Plaintiff and members of the Classes, who could not reasonably discover the Defect through due diligence. Based on pre-production testing, design failure mode analysis, and consumer complaints to dealers and NHTSA, *inter alia*, Defendants were aware of the Defect in the Class Vehicles and fraudulently concealed the Defect from Plaintiff and members of the Classes.

12.     Notwithstanding this knowledge, Defendants continued selling defective vehicles, have failed to disclose the existence of the Defect to Plaintiff and members of the Classes, have not issued a recall addressing the Defect, and have not remedied the issue and/or compensated Class Vehicle owners for the material defect. Rather, Defendants wrongfully and intentionally concealed the Defect from Plaintiff and members of the Classes.

13.     No reasonable consumer expects to purchase or lease a vehicle containing a concealed defect that fails to automatically restart the engine, thus stalling the vehicle on public roadways, and creating a risk of collision and danger to the vehicle and its occupants. The Defect is material to Plaintiff and members of the Classes because when they purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles would be free from defects and not be prone to having their AIS system fail to operate as intended during routine driving, placing vehicle occupants at risk of collision. Had Defendants disclosed the Defect, Plaintiff and members of the Classes would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

14.     Honda offers New Vehicle Limited Warranty coverage for the Honda-branded Class Vehicles for three years or 36,000 miles which promises that, free of charge, "Honda will repair or replace any part that is defective in material or workmanship under normal use," excluding such items as normal wear or deterioration, fluid replacement, damaged window glass (unless due to a manufacturing defect), cosmetic flaws (unless due to a defect in workmanship), and expendable maintenance items. Defendants also provide Powertrain Limited Warranty coverage for Class Vehicles for five years or 60,000 miles that covers, free of charge, the repair or replacement of certain powertrain components, including the engine and transmission.

15.     Defendants also provide warranty coverage for their Acura-branded Class Vehicles that is similar in most respects, differing only in duration of coverage and mileage limits, which increase to four years or 50,000 miles, and six years or 70,000 miles for Acura's New Vehicle Limited Warranty and Powertrain Limited Warranty, respectively.

16.     Plaintiff and the Classes assert claims against Defendants for fraudulent concealment, negligent misrepresentation, unjust enrichment, breach of express and implied warranties, violation of the MMWA, 15 U.S.C. § 2301 *et seq.*, and for violation of the UDTPA, N.C. Gen. Stat. § 75-1.1, *et seq.*

17.     Thus, as a direct result of Defendants' unlawful conduct, Plaintiff and members of the Classes have been harmed and are entitled to, *inter alia*, actual damages, including: damages for diagnosis, repair, and/or replacement of the damaged components; damages for the diminished value of their vehicles; compensatory, statutory, and punitive damages, attorneys' fees, costs, restitution, and/or injunctive and declaratory relief.

## II.     THE PARTIES

### A.     Plaintiff

18.     Plaintiff Deneen Nock is a citizen of North Carolina, and resides in Raleigh, North Carolina.

4

19.     On or around December 31, 2017, Plaintiff purchased a new 2017 Honda Pilot AWD Touring, equipped with the AIS feature, from Leith Honda in Raleigh, North Carolina for personal, family, or household purposes.

20.     Beginning when Plaintiff's Honda Pilot was approximately two years old, it has failed to automatically restart numerous times due to the AIS Defect, endangering Plaintiff. On more than one occasion, Plaintiff's Class Vehicle stalled while she was in an intersection, waiting to make a left turn, and she narrowly avoided collisions with approaching vehicles. Each time that this has occurred, Plaintiff was placed in fear for her safety.

21.     Plaintiff notified the Honda dealership of the AIS Defect in her Class Vehicle, and stated that she was fearful of driving the vehicle, particularly with her daughter in the car. The dealership's representative told Plaintiff that it was "just the way the car is made," and advised her that she could manually override the AIS feature each time the vehicle is driven, but that there was no way to permanently disable it.

22.     Without an effective, convenient, and permanent remedy for the AIS Defect, the AIS feature in Plaintiff's Class Vehicle remains prone to not restarting the engine at the appropriate time, and creates a hazardous condition for Plaintiff and other occupants of her vehicle.

**B.     Defendants**

23.     Defendant AHMC is a California corporation with its principal place of business at 1919 Torrance Boulevard, Torrance, California.

24.     Defendant HML is a Japanese corporation, headquartered in Minato-ku, Tokyo, Japan. At present, HML is the fifth largest automaker in the world with annual revenue of approximately $110 billion. HML is the corporate parent of Defendant AHMC. Below, unless otherwise specified, AHMC and HML, are referred to collectively as "Honda."

25.     Defendants design, engineer, manufacture, market, and/or sell vehicles. Defendants market and distribute vehicles for sale under the Honda and Acura brands,

through their authorized dealers located throughout the United States, including within this District.

26.   At all times relevant to this action, Defendants and/or their agents manufactured, distributed, sold, leased, and warranted the Class Vehicles, containing the defect described herein, throughout the United States. Defendants developed and disseminated the owner's manuals and warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles.

27.   Upon information and belief, at all times relevant to this action, Defendants made decisions related to advertisement, marketing, maintenance schedules, sales, warranties, and recalls of the Class Vehicles at AHMC's Torrance, California headquarters, which is located within this District.

## III.   JURISDICTION AND VENUE

28.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 members of the Classes, members of the Classes (as defined below) are citizens of states different from Defendants, and greater than two-thirds of the members of the Classes reside in states other than the states in which Defendants are citizens. This Court also has jurisdiction over supplemental state law claims pursuant to 28 U.S.C. § 1367 and jurisdiction over the MMWA claim by virtue of diversity jurisdiction being exercised under the Class Action Fairness Act of 2005 ("CAFA").

29.   Venue properly lies in this District pursuant to 28 U.S.C. § 1391(a), (b), and (c) because: Defendant AHMC maintains operational facilities in this District; a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District; Defendants conduct a substantial amount of business in this District; and Defendant AHMC is headquartered in this District. Accordingly, Defendants have sufficient contacts with this District to subject Defendants to personal jurisdiction in the District and venue is proper.

## IV.    FACTUAL ALLEGATIONS

### C.    The AIS Defect

30.    The Class Vehicles are equipped with a 3.5L engine as well as a 9-speed automatic transmission, and all include the Auto-Idle Stop feature.

31.    The Auto-Idle Stop feature is activated by default whenever the Class Vehicles are started. Although the AIS feature can be manually turned off, it will reactivate the next time the vehicle is started.

32.    When engaged and functioning correctly, the AIS feature automatically shuts off the engine when the brakes are applied and the vehicle reaches a complete stop (such as at a red light), and then automatically restarts the engine when the driver releases the brake pedal to resume driving.

33.    Defendants have discovered that, in the Class Vehicles, the AIS feature contains a defect that prevents it from triggering an engine restart when the brake pedal is released after a complete stop. Instead of automatically restarting the engine as expected, the Defect renders the Class Vehicles inoperable and immobile wherever the stall occurs, which frequently will be at a stoplight or stop sign, in stop-and-go traffic, at an intersection while waiting to make a left turn, or at another hazardous location where other drivers will be forced to maneuver around the stalled Class Vehicles to avoid an accident, or possibly fail to react before a collision occurs.

34.    The Defect compromises the comfort, safety, and enjoyment of the Class Vehicles and requires owners to pay out-of-pocket for ineffective repairs, and unnecessary replacement of viable parts, such as batteries, that have not been proven to be contributors to engine restart failures in the Class Vehicles.

35.    On information and belief, the Defect results from the design and/or poor manufacturing of the vehicle.

36.    The Defect was inherent in each of the Class Vehicles and was present at the time of sale or lease.

37.    Defendants knew or should have known about the Defect present in the Class Vehicles, along with the corresponding safety risk, and concealed this information from Plaintiff and members of the Classes at the time of sale or lease and thereafter.

38.    If Plaintiff and members of the Classes had known about the Defect at the time of sale or lease, Plaintiff and members of the Classes would not have purchased or leased the Class Vehicles or would have paid less for them.

39.    As a result of their reliance on Defendants' omissions, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiff and members of the Classes were harmed and suffered actual damages in that the Class Vehicles are defective, that they overpaid for defective vehicles, and that the Class Vehicles' defective AIS systems subject Class Vehicles to the risk of temporary engine stalling, and the corresponding safety risk.

**D.    Defendants Touted Quality, Reliability, and Safety in Their Marketing and Advertising**

40.    Defendants engage in direct marketing to consumers, such as Plaintiff and members of the Classes, via TV and radio commercials, print advertising, and the publication of vehicle brochures which are distributed through their network of authorized dealerships, in order to induce consumers to purchase their vehicles. This comprehensive advertising campaign is ongoing.

41.    Defendants advertise Honda vehicles as offering "[a] personal approach to safety," claiming that Honda's philosophy is "Safety for Everyone":



42.     Defendants' "Facts Guide" for the 2017 Honda Pilot places "Safety" first on its list of "Pilot Key Selling Points."[2]

43.     In brochures for the 2018 Honda Pilot, Defendants flaunt its safety reputation in the industry, boasting: "The Pilot has achieved top ratings from NHTSA and IIHS (The Insurance Institute for Highway Safety), and is equipped with innovative safety and driver-assistive technology[.]"[3]

---

[2] 2017 Pilot Facts Guide, American Honda Motor Co., https://www.honda infocenter.com/2017/Pilot/#feature-guide (last visited Jan. 4, 2023).

[3] 2018 Pilot Brochure, American Honda Motor Co., https://www.honda infocenter.com/-/media/Honda-Sales-Tool-Media-Folder/Images/2018-Pilot/PDFs/ MY18-Pilot-Brochure.ashx.

44.     Similarly, advertising Acura-branded vehicles, Defendants claim that they prioritize safety:



# For Us, Safety is Personal

Stories of appreciation for Acura safety performance are felt deeply. When we get letters of thanks, we take them to heart. We keep them in a scrapbook and look through it often, keeping a real connection to why we do what we do.

**VIRTUAL SAFETY TESTS >**

45.     Defendants make such claims while knowing that they are selling, and have sold, hundreds of thousands of Class Vehicles vulnerable to the Defect and the corresponding safety risk. These claims have helped Defendants to conceal the Defect's existence in order to sell and lease more Class Vehicles and avoid the financial

responsibility to effectively repair and/or replace the defective condition which causes the AIS Defect.

**E.      Defendants' Knowledge of the Defect and Associated Safety Risk**

46.     As set forth below, Defendants have long been aware of the Defect.

47.     Defendants fraudulently, intentionally, negligently, and/or recklessly omitted and concealed from Plaintiff and members of the Classes the Defect in the Class Vehicles even though Defendants knew or should have known of the Defect in Class Vehicles.

48.     Knowledge and information regarding the Defect were in the exclusive and superior possession of Defendants and their authorized dealers, and that information was not provided to Plaintiff and members of the Classes. Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, early consumer complaints made to Defendants' network of exclusive dealers, aggregate warranty data compiled from those dealers, repair orders and parts data received from the dealers, consumer complaints to dealers and NHTSA, and testing performed in response to consumer complaints, *inter alia*, Defendants were aware (or should have been aware) of the Defect in the Class Vehicles and fraudulently concealed the Defect and safety risk from Plaintiff and members of the Classes.

49.     Defendants knew, or should have known, that the Defect and the associated safety risk was material to owners and lessees of Class Vehicles and was not known or reasonably discoverable by Plaintiff and members of the Classes before they purchased or leased Class Vehicles and/or within the applicable warranty periods.

50.     Notwithstanding Defendants' exclusive and superior knowledge of the Defect, Defendants failed to disclose the Defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter, including during the period in which the Class Vehicles were protected by the New Vehicle Limited Warranty and/or the Powertrain Limited Warranty) and continued to sell Class Vehicles containing the

Defect. Defendants intentionally concealed that the AIS Defect presents a safety risk to consumers, including Plaintiff and members of the Classes, and the public.

51.     While designing, manufacturing, engineering, and testing Class Vehicles in advance of the vehicles' release, Defendants would have gained comprehensive and exclusive knowledge about the structural and component vulnerabilities of the Class Vehicles. Defendants would have learned during the design and pre-production stages of the Class Vehicles of the frequency of the failure of the AIS system to trigger an automatic engine restart.

52.     Adequate pre-release analysis of the design, engineering, and manufacture of the Class Vehicles would have revealed to Defendants that the design of the vehicle was defective and that the AIS feature was susceptible to failure of its automatic restart functionality.

### 1.     Defendants Knew About the AIS Defect Based on Complaints Filed with NHTSA

53.     Consumers who purchased or leased Class Vehicles have filed hundreds of complaints with NHTSA reporting the Defect, reporting that their vehicles failed to automatically restart with the AIS feature engaged.

54.     Federal law requires Defendants to monitor defects which can cause a safety issue and report them within five (5) days. See 67 FR 45822 (2000) (amending 49 U.S.C. § 30166(e) (1994)). In fact, manufacturers like Defendants are obligated to maintain sufficient systems to track reports of defects. Defendants regularly monitor NHTSA complaints and track those reports in a system to meet their reporting requirements under federal law and were provided knowledge of the Defect prior to and/or within the express warranty time and mileage limitations through these complaints, *inter alia*.

55.     Over the last five years, NHTSA has received numerous complaints reporting failure of the AIS feature in Honda Pilot and Honda Odyssey Class Vehicles.

56.     Below are excerpts of a sample of consumer complaints made to NHTSA regarding the Defect in Class Vehicles, some of which have been edited for clarity:

- **September 1, 2017—2016 Honda Pilot**

  The vehicle is equipped with start stop feature. The issue is it will stop, then crank for a second or two, but sometimes not restart. It's a safety issue when you try to move with traffic, but the engine is now off. This issue has been reported to the Honda dealer numerous times over a 4 year period. The starter & battery has been replaced, but the issue still exists.

- **March 1, 2018—2016 Honda Pilot**

  The contact owns a 2016 Honda Pilot. The contact stated that while operating the vehicle, the Auto START/STOP fuel-saving feature malfunctioned and the vehicle would not immediately restart after lifting off the brake pedal. The contact indicated that the failure had occurred on multiple occasions. The vehicle was taken to the local dealer who was unable to determine the cause of the failure and no service was performed. The manufacturer was not yet contacted. The failure mileage was 22,000.

- **October 1, 2018—2016 Honda Pilot**

  Vehicle randomly does not automatically restart after auto idle stop engages when in stop-go traffic on freeway or when stopped at intersection, resulting in a stalled vehicle in the middle of freeway or intersection. Attempts to manually restart the vehicle generally successful after frantically (or slowly!) Pushing the start-stop button several times... Issue ongoing since ~ October 2018. Dealer has replaced battery & engine start-stop button to no avail.

- **September 19, 2019—2017 Honda Pilot**

  Auto engine idle stop malfunctioning, leaving vehicle stalled and stranded in the middle of traffic. Has happened two times in last month (Sept. 2019) now with last being on a busy highway with young son in car. Required a

tow ($174 towing bill) and then jump (vehicle had to be removed from busy traffic asap) and very fortunate we were not hit as vehicle was stalled in the middle of 60 mph traffic for nearly 2 hours. The issue happens after the engine idle auto off kicks off the engine but then will not restart when foot is taken off the brake. This does not appear to be a battery issue as battery has been fine since and has not been replaced. Engine idle auto stop feature cannot be turned off permanently and one must remember to turn it off every time you drive the vehicle to mitigate this problem. This is a huge safety issue! Car is approx. 2.5 years old and has approx. 34k miles. Issue has only surfaced recently however. Towing bill attached.

- **December 6, 2019—2017 Honda Pilot**

  Upon exiting stop/start events (auto shut off at stop signs/lights/parking lots), engine does not restart. Instead, it shifts into park, lights up all instruments on display panel, and requires a manual restart. Vehicle is dead until restarted, posing a hazard to occupants/oncoming traffic. Has happened multiple times in past weeks. We also have read of many other owners of '16/'17 Honda Pilot owners having the exact same issue.

- **July 11, 2020—2017 Honda Pilot**

  While traveling south on I-95 from Baltimore, MD to Washington D.C., near Kenilworth Avenue, the engine idle shutoff on my 2017 Honda Pilot touring engaged when I was forced to stop due to a traffic slowdown. When I took my foot off the brake, instead of restarting as it should have, all of the warning lights came on and the engine stalled. I shifted into "park", engaged my emergency flashers, and attempted to restart the engine several times without success. While stopped, I was nearly rear-ended several times because traffic started moving as soon as I took my foot off the brake. I was in a center lane and unable to exit the vehicle or move it from traffic. I was finally able to get restarted after a few minutes

14

and several more tries. I had previously had the vehicle in for issues with the engine idle shutoff and the dealer had replaced the battery, which I thought had fixed the problem. When I took it in this time it happened they say the battery is good and "cannot duplicate the problem". There is a broad base of internet postings for this problem on 2016 - 2018 Pilot elite and touring vehicles, with the 9 speed transmission. There is no way to permanently turn this feature off and I believe it represents a serious safety hazard, especially for highway travel.

- **<u>April 7, 2021—2018 Honda Odyssey</u>**

Our 2018 Honda Odyssey Elite has intermittent issues with the auto start/stop feature. As context, the car engine will automatically stop when the vehicle is fully stopped, for example at a red light, and a few other conditions are met (brake pedal pressure, battery charge, electrical load). Our vehicle when auto stopped may stall when attempting to resume driving. When the driver releases the brake pedal and pushes the accelerator pedal, the car fails to auto start, or auto starts with warning messages. When the car fails to start, a variety of warning messages will be displayed on the dashboard. Remediation varies. The car may respond to shifting to park and pushing the ignition start/stop button twice. At times, the car may not respond to shifting to park and ignition button actions. The only fix then seems to be a 'hard' shutoff that requires opening the driver door and pushing the ignition button, closing the door, pushing the ignition button, and shifting to drive. When the system partially fails, the front collision warning/mitigation system is temporarily disabled. My car is current on all recalls. I recently had dealer service, and they confirmed there are no known bulletins for this issue. The car is current on maintenance schedule and is otherwise in very good operation condition. This situation car be quite stressful when at a busy intersection,

or when trying to pull out to merge into a major road from a stop. This failure could be very dangerous if you needed to move the vehicle quickly, for example if stopped near a railroad crossing. The auto start/stop system is enabled by default to improve fuel economy. It can be manually disabled, however it resets with each shutoff. I would permanently disable it, however, that is not possible apparently for EPA reasons. I have videos showing this behavior.

- **September 1, 2021—2016 Honda Pilot**

  My 2016 Honda Pilot has been experiencing an issue with the auto start-stop system, in which the vehicle's engine fails to restart after a stop and/or the dashboard indicators flash on and off with multiple error codes displaying. This has happened many times on the highway and on streets, one time where it would not restart on the highway and cars were going around me on both sides which was very dangerous. I reported this to Honda corporate and opened up a case, which was open for many months while the Pauly Honda dealer in Libertyville, IL and the Muller Honda dealer in Gurnee, IL tried to diagnose the problem. They ended up trying several fixes, including replacing the battery, but nothing has fixed the issue. The dealer also contacted the engineers at Honda Corporate, and they indicated that they were not aware of the issue and have not been able to provide any fixes. This is still an issue today, and the only workaround I have is to disable the auto start/stop function manually, every time I start the car. Dates: - I checked and we actually brought our car into Muller Honda of Gurnee in September 2021 where we reported an issue where "C/S (customer) feels like it wants to die coming to a stop. Dash lights turn off like vehicle died. All displays go dark." They felt that it was "Caused by: Technician verified keyless remote system problem light on dash. Tech found code B12C5 stored in system. Corrected by (Y9300)

(6S100) Warranty extension. Keyless start system error with DTC B12C5 Bulletins". This did not fully resolve the issue. - Then in October 2021 we brought the car into Pauly Honda of Libertyville where we again reported the same issue where "Customer states in eco mode the center screen now goes blank then cycles and comes back on." This did not fully resolve the issue. - Then in the spring of 2022 we brought it back to Pauly Honda as more severe issues started occurring. I also opened up Case #13103604 with Honda Corporate.

- **July 6, 2022—2018 Honda Pilot**

  I was stopped at a stop light and the car was in auto engine idle. After releasing the brake when the light turned green, the engine shut off and the dash told me to put the car in park and restart by pushing the brake and hitting the engine start button. This process took about 30 seconds for the car to finally restart and I was sitting in the middle of traffic with cars behind me that had anticipated me moving forward when the light changed. Several warning symbols popped up including the collision mitigation system. This is an easy way to get rear-ended. In other instances, I have had issues where the radio and engine shuts off after releasing the brake when in auto engine idle at a stop light or driving in slower traffic but it kicks back on in just a second with no need to stop and restart. Both of these issues are very concerning. Battery life is fine, so that is not the issue. Issue stops when auto engine idle is disabled.

- **September 14, 2022—2018 Honda Odyssey**

  On at least 3 occasions, the "Auto Engine Idle Stop" has caused my vehicle to completely die while stopped at a stop light. When the car shuts off/dies, the system prompts you to shift the car in park and restart the car, but on these occasions, the car did not start, leaving me stalled in active traffic. I felt very unsafe to be stalled with no way to operate the vehicle.

17

The dealership checked the battery to ensure it wasn't a battery issue and found it to be completely fine. At the time we did not realize that it could be a problem with the Auto Engine Idle Stop feature, otherwise we would've had them check that system specifically. Further research from other customer forums online prompted us to turn this feature off, but we have to do that every time we start the car. There is no way for us to turn it off permanently. The car gives you no warning that this will happen. When you remove your foot from the break [sic] to resume driving, the car shuts off without immediately restarting, leaving you stranded. I am hoping that Honda will issue a recall on affected models. At this point they aren't offering any help other than to tell us to turn it off, but you have to remember to do that every time you start your vehicle.

- **October 15, 2022—2020 Honda Pilot**

  The Honda Auto Start Stop system has been taxing my battery through daily use and creates unsafe situations. On more than one occasion, similar to the following, I have experienced the Honda Pilot stop the engine via the A.S.S. System. Upon releasing the brake, the system attempts, but fails, to come to ignition and the electrical system lacks the ability to start the engine, creating a need to re-start (or attempt restart). On 1 such occasion, my family was traveling through a city on the interstate. After driving on the interstate for a few hours we came to a stop light and stopped. At the green light, upon releasing the brake, the Honda Pilot attempted to start again and failed. The car went completely dead in the middle of a 4 lane interstate with my family inside. The car did not start again until the 3rd time attempting to restart the vehicle. Approximately 10 seconds later than intended, we were able to clear our vehicle from the interstate intersection. On normal occasions, such as the course of business with the Honda A.S.S. System, driving in situations

that would be categorized as "start/Stop" situations, the Honda A.S.S. System leads to stalled response and delayed lurching into traffic creating situations due to the delay in response. Multiple times this has been reported to my dealer. They acknowledge it as a "Battery" problem. They test my battery per HONDA WARRANTY and tell me it "Passes". They basically are just charging my battery and sending me out the door. The time between vehicle events is decreasing. Please help address this obvious vehicle shortcoming. There is no permanent means to disable it. Thank you.

- **December 6, 2022—2020 Honda Pilot**

I have owned the 2020 Honda Pilot Touring since Jan. 2021. Up till now, these [sic] similar situations have happened 4-5 times. It always happens when I am gradually slowing down to a complete stop at crossroads. My 2020 Honda Pilot has shut off a few times while stopping at a red light. Each time has been after coming to a complete stop at a red light and sitting there for a couple minutes. Suddenly there is a beep sound and the engine shuts down. Only the entertainment system is left on. The gear changes to N by itself and I am unable to change it to any other gear. With my foot on the brake, trying to change the gear and trying turn off the car for about 3 minute in the middle of traffic with my kids in the car, eventually I was able to shut off the engine completely off. I immediately try restart the car to avoid a car accident. It put itself in N (neural) and the dashboard screen said "Put it in P (Park) and hit bottom to restart car." The car wouldn't let me push anything. The power button did nothing and even if you pushed the P for park it stayed in N. The battery light immediately came on when this happened also. And went away as soon as it worked again. I scheduled an appointment after the third time this happen leaving the car for them to run tests. They ran the tests and when

I returned to pick it up, the technician said they tested the battery, wiring, and engine and that everything was good. Nothing was provided to me but they did show me the report as they talked about the results I am sure I can obtain if requested. They almost changed me for the testing but waived the fee which I was thankful. I am concerned and at times scared for the safety of my kids and I. I really hope Honda finds a fix for this and recalls for whatever the issues are as quickly as possible. I like the car but it really is making me want to get a new car and never purchase from Honda again.

57.    Because the majority of complaints are made directly to Defendants' authorized dealerships, it is reasonable to infer Defendants have received, either directly from customers or through its exclusive network of dealers, several times the number of complaints identified above.

58.    Additionally, NHTSA received a number of similar complaints relating to the AIS Defect in the Acura-branded Class Vehicles:

- **April 16, 2021—2016 Acura TLX**

  I have some serious issues with Acura TLX with idle stop feature. My car had the same issues last year, when the car didn't turn back on automatically after the idle stop feature activated. I took my car to the dealership (Acura of Fremont, CA) and they can't able to figure out the root cause and my car battery died in the middle of the road. It took 3 -4 hours to take the car to the dealership and they replaced the battery but now this issue started happening again. I called Acura customer service and they provided me this case number # [xxx] and forward the case to local dealership (Acura of Fremont, CA). I have dropped the car at the dealership but they are not very hopeful to find out the root cause of this issue. This issue is really a safety risk and not sure what you are planning

to do to address this issue. It's seems to be a known issue with idle stop feature. Please feel to reach out to me at [xxx]. Thanks.

- **July 1, 2021—2019 Acura MDX**

I have had problems with the car stalling or shifting to neutral from drive after the auto stop feature is engaged. This typically happens when the engine tries to restart after having shutoff at the stop. It is difficult to replicate the problem and the dealer can't seem to replicate the problem but it has happened to me many times, particularly in hot weather or after long drives. Typically it happens after a long drive or a lot of around town driving (maybe when the engine is hot?). The dealer does not believe it is related to the fuel pump replacement but that is when it seemed to have started happening but this is entirely speculation. Very frustrating as I have been to the dealer 3 times with the problem and they cannot "replicate" it. They supposedly also replaced the battery and updated the software in the car but that has not solved it. I am growing concerned because it is very dangerous, particularly when stopped at a busy intersection. The last stall happened and it took a minute or so to get the car running again at a busy and large intersection. I am also worried about [this] happening when on an incline. It doesn't happen all of the time, sometimes there is just a hesitation but the car starts and lurches forward. I have a 2019 with about 35K miles on it and have used primarily for long distance trips and not much around town driving. I have attached the dealer work orders for the three visits but stopped bringing the car in because it has been a waste of time as they are unable to find the issue. Also, I have reported the issue twice to American Honda and they have sent me back to the dealer with no results. This is a dangerous situation and I noticed that there is a related recall for the Acura TLX model with

the same engine. This problem is ongoing and has happened to me twice in the past 2 days if I forget to disable the auto shutoff feature. Thanks.

- **February 16, 2022—2018 Acura TLX**

  Engine fails to start after idle stop, when the idle-stop off button is not engaged, and the battery doesn't have enough power to re-start the vehicle. Essentially, the engine tries to start up at a traffic light/intersection but fails, causing the car to turn off and shift to Neutral without warning. I then have to realize what is happening, shift the car from Neutral to Park, and hit the start button to be able to re-start the car. There is no warning from the car that the battery is going to be unable to keep the car running, so the stall is 100% unexpected. This is unsafe, as the re-start procedure is not intuitive, takes time, and causes cars behind you to start honking. It could very easily cause a crash. Either Acura needs to fix this issue with a battery warning, or provide the option of turning the auto-idle stop off button on permanently (which some members of our government wouldn't like, but would fix the problem and keep someone from being seriously injured). This is also a known issue by Honda/Acura, as many other owners are reporting it: https://www.tlxforums. com/threads/engine-failing-to-start-after-idle-stop.31809/.

- **May 8, 2022—2019 Acura TLX**

  The auto start stop feature failed to start vehicle in 3 different occasions, leading to a traffic jam every time and vehicles behind me almost hitting me because they thought I will be moving with traffic, still waiting on Acura for appointment to bring vehicle.

- **November 12, 2022—2020 Acura MDX**

  When the brake is suppressed at a Stop sign or stop light, the vehicle has an Auto Idle stop feature which shuts off the engine completely to preserve fuel. The vehicle is supposed to restart once the brake is released.

In my case, there have been multiple times when the brake is released but fails to restart and go. I have encountered the issue in the following scenarios: 1. Getting off the freeway, if there is a line getting off the freeway, then the vehicle will potentially shut off and fail to restart. This is a safety hazard as the driver behind me or others behind at a distance can potentially hit the vehicle. 2. At a Stoplight, especially when making a left turn, the vehicle will shut off and fail to restart. It takes more than 8 secs to restart/reengage by restarting manually. If there are any vehicles attempting to go behind me or at a distance, then they can potentially hit my vehicle. This is a huge risk to my family and I, to assist in our safety, we end up having to turn on our hazard lights. This is unacceptable especially since this is a 2020 vehicle with under 45k miles. I have attempted to reach out to the Acura service team, Customer relations team and even called the Warranty department. However, they were not taking ownership on the issue and responded as it has not been reported before. Based on forums, the issue is being encountered by other owners as well. Hopefully, this can be sorted in the near future for safety of my family.

59.     A recurring theme in many of the complaints received by NHTSA concerning the AIS Defect in the Class Vehicles is the inherent danger of the sudden and unexpected failure of the Class Vehicles' engines to restart while the AIS feature is engaged. In the eyes of the average consumer, the Class Vehicles are unsafe, and this obvious fact cannot be lost on Defendants.

## 2.     Defendants Issued a Service Message Related to Early Complaints of the AIS Defect in the Class Vehicles

60.     The AIS Defect is known to Defendants. On May 10, 2018, Defendant AHMC's Technical Research & Support Group issued a service message to its Service Managers in which it acknowledged customer complaints of an inoperative AIS feature in certain Class Vehicles. AHMC requested to be alerted if vehicles exhibiting

symptoms of the Defect were brought into dealerships for service so that corporate-level technicians could perform inspections before repairs of any kind were attempted, "in order to fully understand the cause of this condition."[4]

### 3. NHTSA Opened a Preliminary Investigation Into the AIS Defect in Class Vehicles

61. The AIS Defect is so widespread and concerning that, after receiving more than 200 complaints from Honda customers whose Class Vehicles experienced failure of the AIS feature, NHTSA's Office of Defects Investigation ("ODI") opened a Preliminary Investigation ("PE") on June 3, 2022 to look into the issue in the Honda Pilot Class Vehicles,[5] and has requested from Defendants extensive data regarding all Class Vehicles.[6]

62. In the "ODI Resume," documenting the initiation of the PE, NHTSA confirms having multiple meetings with Defendants, and that "Honda indicated that per the information provided from NHTSA complaints and TREAD (Transportation Recall Enhancement, Accountability and Documentation) reports, [Defendants] have found a correlation with customers' allegations for the Auto Start/Stop failure to restart the vehicle when the system is activated.[7]

63. More than four years after issuing internal company communications that demonstrate Defendants' knowledge of the existence of the AIS Defect, and scores of customer complaints later, Defendants have yet to issue a recall, extend the warranty

[4] Service Message MC-10142619-9999, American Honda Motor Co. (May 10, 2018), https://static.nhtsa.gov/odi/tsbs/2018/MC-10142619-9999.pdf.

[5] ODI Resume Investigation PE 22-005, NHTSA, (June 3, 2022) https://static.nhtsa.gov/odi/inv/2022/INOA-PE22005-9303.PDF.

[6] Letter from Sharon Yukevich, NHTSA, to Jeff Chang, American Honda Motor Co., (June 17, 2022) https://static.nhtsa.gov/odi/inv/2022/INIM-PE22005-87993P.pdf.

[7] ODI Resume Investigation PE 22-005, NHTSA (June 3, 2022) https://static.nhtsa.gov/odi/inv/2022/INOA-PE22005-9303.PDF.

of the Class Vehicles, offer effective repairs and/or appropriate replacement parts, or take any other corrective action with regard to the AIS Defect in the Class Vehicles.

## V.    TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

64.    Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the Defect and the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and members of the Classes were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendants' deception with respect to the Defect.

65.    Plaintiff and members of the Classes did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing a defect and/or that the Class Vehicles contained the Defect and corresponding safety risk. As alleged herein, the existence of the Defect was material to Plaintiff and members of the Classes at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiff and members of the Classes could not have discovered through the exercise of reasonable diligence the existence of the Defect or that Defendants were concealing the defect.

66.    At all times, Defendants are and were under a continuous duty to disclose to Plaintiff and members of the Classes the true standard, quality, and grade of the Class Vehicles and to disclose the Defect and corresponding safety risk.

67.    Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and members of the Classes reasonably relied on Defendants' knowing, active, and affirmative concealment.

68.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VI.   CLASS ACTION ALLEGATIONS

69.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and/or (b)(3) on behalf of the following Class and Sub-Class:

**Nationwide Class**: All persons or entities in the United States who purchased, leased, or own a Class Vehicle (the "Nationwide Class" or "Class");

**North Carolina Sub-Class**: All persons or entities who purchased, leased, or own a Class Vehicle in the State of North Carolina (the "North Carolina Sub-Class").

70.     Excluded from the Class and Sub-Class are Defendants and their parents, subsidiaries, and corporate affiliates. Plaintiff reserves the right to revise the definition of the Class and Sub-Class based upon subsequently discovered information and reserves the right to establish additional Sub-Classes where appropriate. The Class and Sub-Class are collectively referred to herein as the "Classes."

71.     The Classes are so numerous that joinder of all members is impracticable. Plaintiff believes that there are at least tens of thousands of proposed members of the Classes throughout the United States.

72.     Common questions of law and fact exist as to all members of the Classes and predominate over any issues solely affecting individual members of the Classes. The common and predominating questions of law and fact include, but are not limited to:

- Whether the Class Vehicles contain the AIS Defect;
- Whether the AIS Defect is a design defect and/or a defect in material, manufacturing, and/or workmanship;
- Whether the AIS Defect in the Class Vehicles presents a safety risk;
- Whether and when Defendants knew or should have known about the AIS Defect;
- Whether Defendants knew or should have known that the AIS Defect in Class Vehicles presents a safety risk;
- Whether Defendants had a duty to disclose the AIS Defect;
- Whether Defendants breached their duty to disclose the AIS Defect;

26

- Whether Defendants intentionally and knowingly concealed, suppressed, and/or omitted material facts concerning the standard, quality, or grade of the Class Vehicles and/or the AIS Defect;

- Whether Defendants negligently omitted material facts concerning the standard, quality, or grade of the Class Vehicles and/or the AIS Defect;

- Whether Defendants made material omissions concerning the standard, quality, or grade of the Class Vehicles and/or the AIS Defect;

- Whether members of the Classes would pay less for a Class Vehicle if Defendants, at the time of purchase or lease, disclosed the AIS Defect;

- Whether members of the Classes would have purchased or leased a Class Vehicle if Defendants, at the time of purchase or lease, disclosed the AIS Defect;

- Whether Defendants actively concealed material facts from Plaintiff and members of the Classes in order to, *inter alia*, sell more Class Vehicles and/or transfer repair or replacement costs to Plaintiff and members of the Classes;

- Whether Defendants breached their express and/or implied warranties to Plaintiff and members of the Classes;

- Whether Defendants violated the MMWA, 15 U.S.C. § 2301, *et seq*.;

- Whether Defendants violated the UDTPA, N.C. Gen. Stat. § 75-1.1, *et seq*.;

- Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted.

73.    Plaintiff's claims are typical of the claims of the Classes that Plaintiff seeks to represent. As alleged herein, Plaintiff and the Classes sustained damages arising out of the same unlawful actions and conduct by Defendants.

74.    Plaintiff is willing and prepared to serve the Classes in a representative capacity with all of the obligations and duties material thereto. Plaintiff will fairly and

adequately protect the interests of the Classes and has no interest adverse to or in conflict with the interests of the other members of the Classes.

75.     Plaintiff's interests are co-extensive with and are not antagonistic to those of absent members within the Classes. Plaintiff will undertake to represent and protect the interests of absent members within the Classes and will vigorously prosecute this action.

76.     Plaintiff has engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action and will assert and protect the rights of, and otherwise represent, Plaintiff and absent members of the Classes.

77.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

78.     Class action status is warranted under Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

79.     The Classes may also be certified under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted on grounds generally applicable to the Classes, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Classes.

80.     The interest of members within the Classes individually controlling the prosecution of separate actions is theoretical and not practical. The Classes have a high degree of similarity and are cohesive, and Plaintiff anticipates no difficulty in the management of this matter as a class action.

81.     The nature of notice to the proposed Classes is contemplated to be by direct mail upon certification of the Classes or, if such notice is not practicable, by the best notice practicable under the circumstance including, *inter alia*, email, publication in major newspapers, and/or on the internet.

## VII.   CLAIMS FOR RELIEF

**COUNT I**

**Breach of Express Warranty**

**(On behalf of the Nationwide Class and the North Carolina Sub-Class)**

82.     Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

83.     Plaintiff brings this count individually and on behalf of all Class members.

84.     Defendants marketed the Class Vehicles as safe, reliable vehicles. Such representations formed the basis of the bargain in Plaintiff's and members of the Classes' decisions to purchase or lease the Class Vehicles.

85.     Defendants are and were at all relevant times merchants and sellers of motor vehicles within the meaning of the Uniform Commercial Code.

86.     With respect to leases, Defendants are and were at all relevant times lessors of motor vehicles within the meaning of the Uniform Commercial Code.

87.     The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code.

88.     In connection with the purchase or lease of each of the Honda-branded Class Vehicles, Defendants provide New Vehicle Limited Warranty coverage for the Class Vehicles for three years or 36,000 miles, promising that, free of charge, "Honda will repair or replace any part that is defective in material or workmanship under normal use." The New Vehicle Limited Warranty coverage excludes "normal wear or deterioration of any part; the adding of fluids, unless part of a needed warranty repair; broken, chipped or scratched window glass unless it is due to a defect in material or

29

workmanship; and any item concerning the general appearance of the vehicle that is not due to a defect in workmanship; and expendable maintenance items."

89.    Defendants also provide a Powertrain Limited Warranty in connection with the purchase or lease of each of the Honda-branded Class Vehicles which promises that for five years or 60,000 miles Honda will cover, free of charge, the repair or replacement of certain powertrain components, including the engine and transmission. Under the warranties provided to Plaintiff and members of the Classes, Defendants promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, Defendants breached these warranties.

90.    In connection with the purchase or lease of each of the Acura-branded Class Vehicles, Defendants provide New Vehicle Limited Warranty coverage for the Class Vehicles for four years or 50,000 miles which promises that, free of charge, "Honda will repair or replace any part that is defective in material or workmanship under normal use." The New Vehicle Limited Warranty coverage excludes "normal wear or deterioration of any part; the adding of fluids, unless part of a needed warranty repair; broken, chipped or scratched window glass unless it is due to a defect in material or workmanship; any item concerning the general appearance of the vehicle that is not due to a defect in workmanship; and expendable maintenance items."

91.    Defendants also provide Powertrain Limited Warranty coverage for Acura-branded Class Vehicles for six years or 70,000 miles that covers, free of charge, the repair or replacement of certain powertrain components, including the engine and transmission. Under the warranties provided to Plaintiff and members of the Classes, Defendants promised to repair or replace covered components arising out of defects in materials and/or workmanship, including the Defect, at no cost to owners and lessees of the Class Vehicles and within a reasonable time. As alleged herein, Defendants breached these warranties. Defendants' warranties formed a basis of the bargain that

was reached when Plaintiff and members of the Classes purchased or leased their Class Vehicles.

92. Plaintiff and members of the Classes experienced the existence of the Defect within the warranty periods but had no knowledge of the existence of the Defect and associated safety hazard, which were known and concealed by Defendants. Despite the existence of the warranties, Defendants failed to adequately inform Plaintiff and members of the Classes that the Class Vehicles contained the Defect and failed to provide a suitable remedy or repair free of charge within a reasonable time.

93. Defendants breached the express warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts it supplied.

94. On information and belief, Defendants have not suitably repaired or replaced the Defect free of charge for Plaintiff and members of the Classes despite the existence of the Defect in the Class Vehicles at the time of sale or lease.

95. Defendants were provided notice of the Defect by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA, and through their own testing. Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because Defendants have known of and concealed the AIS Defect and have failed to provide a suitable repair or replacement to remedy the AIS Defect free of charge within a reasonable time.

96. Any attempt by Defendants to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Classes. Among other things, Plaintiff and the members of the Classes did not determine these limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and members of the Classes, and Defendants knew or should have

known that the Class Vehicles were defective at the time of sale or lease and that the AIS Defect posed a safety hazard.

97. Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and members of the Classes whole because, on information and belief, Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

98. Defendants knew that the Class Vehicles were inherently defective and did not conform to their warranties, and Plaintiff and members of the Classes were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

99. As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and members of the Classes have been damaged in an amount to be determined at trial.

100. Finally, because of Defendants' breach of express warranty as set forth herein, Plaintiff and members of the Classes assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and members of the Classes of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

**COUNT II**

**Violation of the Magnuson-Moss Warranty Act ("MMWA"),**

**15 U.S.C. § 2301, *et seq.***

**(On behalf of the Nationwide Class and the North Carolina Sub-Class)**

101. Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

102. Plaintiff brings this count individually and on behalf of all Class members.

103. The Class Vehicles are "consumer product[s]" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

104.   Plaintiff and Class members are "consumer[s]" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

105.   Defendants are "supplier[s]" and "warrantor[s]" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

106.   Defendants' express warranty is a "written warranty" within the meaning of the MMWA, 15 U.S.C. § 2301(6).

107.   The MMWA provides a cause of action for any customer who is damaged by the failure of a warrantor to comply with a written or implied warranty. See 15 U.S.C. § 2310(d)(1).

108.   Defendants provided Plaintiff and members of the Classes with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Specifically, Defendants provided a New Vehicle Limited Warranty and Powertrain Limited Warranty. Under warranties provided to members of the Classes, Defendants promised to repair or replace covered defective components arising out of defects in materials and/or workmanship, including the Defect, at no cost to owners and lessees of the Class Vehicles. As alleged herein, Defendants breached these warranties.

109.   Plaintiff and members of the Classes experienced the Defect within the warranty periods but Defendants failed to inform Plaintiff and members of the Classes of the existence of the Defect within reasonable time of learning of the Defect and associated safety hazard, and failed to provide a suitable remedy or repair of the Defect free of charge within a reasonable time.

110.   Any attempt by Defendants to disclaim or limit their express or implied warranties is unconscionable and unenforceable here. Specifically, Defendants' warranty limitations are unenforceable because they knowingly sold or leased a defective product without informing consumers about the defect. The limits contained in Defendants' warranty periods are also unconscionable and inadequate to protect Plaintiff and members of the Classes. Among other things, Plaintiff and members of the Classes did not determine these limitations, the terms of which unreasonably

favored Defendants. A gross disparity in bargaining power existed between Defendants and members of the Classes, and Defendants knew or should have known that the Class Vehicles' AIS feature was defective at the time of sale or lease and that they posed a safety risk.

111.   The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

112.   Defendants breached these warranties by failing to disclose and fraudulently concealing information regarding the standard, quality, or grade of the Class Vehicles and the presence of the Defect. Without limitation, the Class Vehicles share a common defect in design, material, manufacturing, and/or workmanship that fails to operate as represented by Defendants and presents a safety risk.

113.   Affording Defendants a reasonable opportunity to cure their breach of warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, Defendants knew, or were reckless in not knowing, of the material omissions concerning the standard, quality, or grade of the Class Vehicles and the presence of the Defect, but failed to repair or remedy and/or disclose the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff resorts to an informal dispute resolution procedure and/or affords Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

114.   Plaintiff and members of the Classes would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to Defendants. Thus, Plaintiff and members of the Classes have not re-accepted their Class Vehicles by retaining them.

115.   The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of

1   $50,000, exclusive of interest and costs, computed on the basis of all claims to be

2   determined in this lawsuit.

3        116.   Plaintiff, individually and on behalf of members of the Classes, seeks all

4   damages permitted by law, including diminution in the value of the Class Vehicles, in

5   an amount to be proven at trial.

6                                    **COUNT III**

7                    **Breach of Implied Warranty of Merchantability**

8        **(On behalf of the Nationwide Class and the North Carolina Sub-Class)**

9        117.   Plaintiff incorporates by reference and re-alleges the allegations contained

10   in the preceding paragraphs of this Complaint.

11       118.   Plaintiff brings this count individually and on behalf of all Class members.

12       119.   Plaintiff and members of the Classes purchased or leased the Class

13   Vehicles from Defendants by and through Defendants' authorized agents for retail

14   sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles

15   when bought from a third party. At all relevant times, Honda was the manufacturer,

16   distributor, warrantor, and/or seller of Class Vehicles. Honda knew or had reason to

17   know of the specific use for which the Class Vehicles were purchased or leased.

18       120.   Defendants are and were at all relevant times "merchants" and "sellers"

19   of motor vehicles within the meaning of the Uniform Commercial Code.

20       121.   With respect to leases, Defendants are and were at all relevant times

21   "lessor[s]" motor vehicles within the meaning of the Uniform Commercial Code.

22       122.   The Class Vehicles are and were at all relevant times "goods" within the

23   meaning of the Uniform Commercial Code.

24       123.   Defendants impliedly warranted that the Class Vehicles were in

25   merchantable condition and fit for the ordinary purpose for which vehicles are used.

26       124.   The Class Vehicles, when sold or leased and at all time thereafter, were

27   not in merchantable condition and were and are not fit for the ordinary purpose of

28   providing safe and reliable transportation. The Class Vehicles contain an inherent

defect—the AIS Defect—(at the time of sale or lease and thereafter), and present an undisclosed safety hazard to drivers and occupants. Thus, Defendants breached their implied warranty of merchantability.

125.   Defendants cannot disclaim their implied warranty as they knowingly sold or leased a defective product.

126.   Defendants were provided notice of the Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA, and through their own testing. Affording Defendants a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile here because Defendants have known of and concealed the Defect and, on information and belief, have refused to repair the Defect free of change within a reasonable time.

127.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and members of the Classes have been damaged in an amount to be proven at trial.

128.   Any attempt by Defendants to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Classes. Among other things, Plaintiff and members of the Classes did not determine these limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and members of the Classes, and Defendants knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Defect posed a safety hazard.

129.   Plaintiff and members of the Classes have been excused from performance of any warranty obligations as a result of Defendants' conduct described herein.

130.   The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule, fraudulent concealment, and the terms of the express warranty.

## COUNT IV

### Fraudulent Concealment

### (On behalf of the Nationwide Class and the North Carolina Sub-Class)

131.   Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

132.   Plaintiff brings this count individually and on behalf of all Class members.

133.   Defendants intentionally and knowingly concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the Class Vehicles and the presence of the Defect in the Class Vehicles, with the intent that Plaintiff and members of the Classes rely on Defendants' omissions. As a direct result of Defendants' fraudulent conduct, members of the Classes have suffered actual damages.

134.   Defendants knew (at the time of sale or lease and thereafter) that the Class Vehicles contained the Defect, concealed the Defect, and never intended to repair or replace the Defect during the warranty periods. To date, Defendants have not provided Plaintiff or members of the Classes with a repair or remedy that will eliminate the Defect.

135.   Defendants owed a duty to disclose the Defect and its corresponding safety hazard to Plaintiff and members of the Classes because Defendants possessed superior and exclusive knowledge regarding the Defect. Rather than disclose the Defect, Defendants intentionally and knowingly concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the Class Vehicles and the presence of the Defect, to sell additional Class Vehicles and avoid the cost of repair or replacement.

136.   The fact that the Defect causes the AIS system to fail to automatically restart the engine while the feature is engaged is material because Plaintiff and

members of the Classes had a reasonable expectation that the vehicles would not expose them and other vehicle occupants to such a safety hazard. No reasonable consumer expects a vehicle to be designed, manufactured, and assembled such that the engine can suddenly and unexpectedly stall, leaving its occupants vulnerable to the danger of a collision.

137.   Plaintiff and members of the Classes would not have purchased or leased the Class Vehicles but for Defendants' omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Defect, or would have paid less for the Class Vehicles.

138.   Defendants knew their concealment and suppression of material facts were false and misleading and knew the effect of concealing those material facts. Defendants knew their concealment and suppression of the Defect would sell more Class Vehicles and would discourage Plaintiff and members of the Classes from seeking replacement or repair of the Defect. Further, Defendants intended to induce Plaintiff and members of the Classes into purchasing or leasing the Class Vehicles and to discourage them from seeking replacement or repair of the Defect, in order to decrease costs and increase profits.

139.   Defendants acted with malice, oppression, and fraud.

140.   Defendants owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at Honda, because Plaintiff and the other Class members relied on Defendants' material representations that the Class Vehicles they were purchasing were safe and free from defects.

141.   The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased the Class Vehicles at the prices they paid.

142.    Plaintiff and the other Class members relied on Defendants' reputation–along with Defendants' failure to disclose the faulty and defective nature of the AIS feature–in purchasing or leasing the Class Vehicles.

143.    Plaintiff and members of the Classes reasonably relied upon Defendants' knowing concealment and omissions. As a direct and proximate result of Defendants' omissions and active concealment of material facts regarding the Defect and associated safety hazard, Plaintiff and members of the Classes have suffered actual damages in an amount to be determined at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

144.    Defendants' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

### COUNT V

### Negligent Misrepresentation

### (On behalf of the Nationwide Class and the North Carolina Sub-Class)

145.    Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

146.    Plaintiff brings this count individually and on behalf of all Class members.

147.    Defendants owed a duty to disclose the Defect and its corresponding safety risk to Plaintiff because Defendants possessed superior and exclusive knowledge regarding the Defect and associated risks.

148.    Defendants negligently omitted material facts including the standard, quality, and grade of the Class Vehicles and/or the presence of the Defect in the Class Vehicles. As a direct result of Defendants' negligent conduct, Plaintiff has suffered actual damages.

149.    The Defect is material to Plaintiff because Plaintiff had a reasonable expectation that the vehicles would not contain a defect, such as the AIS Defect, that exposes vehicle occupants to a significant safety risk and for which Honda currently offers no remedy. No reasonable consumer expects a vehicle to contain a concealed defect in design, manufacture, materials, or workmanship, such as the Defect that fails to automatically restart the engine as intended, and for which no remedy is available.

150.    Plaintiff would not have purchased the Class Vehicles but for Defendants' negligent omissions of material facts regarding the nature and quality of the Class Vehicles and/or the existence of the Defect and corresponding safety risk, or would have paid less for the Class Vehicles. Plaintiff justifiably relied upon Defendants' negligent omissions of material facts.

151.    As a direct and proximate result of Defendants' negligent omissions or material facts regarding the standard, quality, or grade of the Class Vehicles and/or the presence of the Defect and corresponding safety risk, Plaintiff has suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## COUNT VI

### Unjust Enrichment

**(On behalf of the Nationwide Class and the North Carolina Sub-Class)**

152.    Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint.

153.    Plaintiff brings this count individually and on behalf of all Class members.

154.    Plaintiff and members of the Classes conferred a benefit on Defendants by leasing or purchasing the Class Vehicles. Defendants were and should have been reasonably expected to provide Class Vehicles free from the Defect and associated safety risks.

155.    Defendants unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of its omissions and concealment of the Defect in the Class Vehicles.

156.   As a proximate result of Defendants' omissions and concealment of the Defect in the Class Vehicles, and as a result of Defendants' ill-gotten gains, benefits, and profits, Defendants have been unjustly enriched at the expense of Plaintiff and members of the Classes. It would be inequitable for Defendants to retain their ill-gotten profits without paying the value thereof to Plaintiff and members of the Classes.

157.   Plaintiff and members of the Classes are entitled to restitution of the amount of Defendants' ill-gotten gains, benefits, and profits, including interest, resulting from its unlawful, unjust, and inequitable conduct.

158.   Plaintiff and members of the Classes seek an order requiring Defendants to disgorge their gains and profits to Plaintiff and members of the Classes, together with interest, in a manner to be determined by the Court.

**COUNT VII**

**Violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA")**

**N.C. Gen. Stat. § 75-1.1, *et seq*.**

**(On behalf of the North Carolina Sub-Class)**

159.   Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of the Complaint.

160.   Plaintiff brings this count individually and on behalf of the members of the North Carolina Sub-Class.

161.   Defendants engaged in "commerce" in North Carolina within the meaning of the UDTPA. See N.C. Gen. Stat. § 75-1.1(b).

162.   The UDTPA prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

163.   In violation of the UDTPA, Defendants employed deceptive and/or unconscionable acts or practices, fraud, false pretense, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale and/or

1 lease of Class Vehicles in North Carolina. Defendants knowingly concealed,
2 suppressed, and/or omitted material facts regarding the and corresponding safety risk,
3 and misrepresented the standard, quality, or grade of the Class Vehicles, which directly
4 caused harm to Plaintiff and members of the North Carolina Sub-Class.

5     164.   Defendants intentionally and knowingly misrepresented and omitted facts
6 regarding the AIS Defect with the intent to mislead Plaintiff and members of the North
7 Carolina Sub-Class. Defendants knew, or should have known, that the AIS Defect was
8 a latent defect and that the AIS feature was likely to fail outside of the periods of the
9 manufacturer's warranties. Defendants also knew, or should have known, that the AIS
10 Defect in the Class Vehicles could cause the AIS feature to fail to automatically restart
11 the engine while engaged, leading to a temporary loss of engine power while the
12 vehicle was operating. Further, Defendants knew, or should have known, that such loss
13 of power could cause the Class Vehicles to become involved in rear-end collisions or
14 other accidents, putting vehicle operators, passengers and other motorists at risk for
15 injury.

16     165.   Defendants owed a duty to disclose the AIS Defect and its corresponding
17 safety risk to Plaintiff and members of the North Carolina Sub-Class because it
18 possessed superior and exclusive knowledge regarding the defect and the risks
19 associated with the AIS feature's failure. Rather than disclose the defect, Defendants
20 engaged in deceptive trade practices in order to sell additional Class Vehicles and
21 wrongfully transfer the cost of repair or replacement of the AIS system to Plaintiff and
22 members of the North Carolina Sub-Class.

23     166.   Defendants' unconscionable or deceptive acts or practices, affirmative
24 misrepresentations, and/or material omissions regarding the AIS Defect were intended
25 to mislead consumers and misled Plaintiff and members of the North Carolina Sub-
26 Class.

27     167.   At all relevant times, Defendants' unconscionable or deceptive acts or
28 practices, affirmative misrepresentations, and/or omissions regarding the AIS Defect

and its corresponding safety risk were material to Plaintiff and members of the North Carolina Sub-Class. When Plaintiff and members of the North Carolina Sub-Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles would not contain the AIS Defect and would not pose an unavoidable safety risk. Had Defendants disclosed that the AIS Defect existed in the Class Vehicle and/or presented an unavoidable safety risk, Plaintiff and members of the North Carolina Sub-Class would not have purchased or leased the Class Vehicles or would have paid less for their vehicles. Further had Defendants disclosed that the AIS Defect existed in the Class Vehicles and/or presented an unavoidable safety risk, Plaintiff and members of the North Carolina Sub-Class would have demanded repair or replacement during the warranty periods at no cost—as provided for in Defendants' warranties.

168. Defendants had a continuous duty to Plaintiff and members of the North Carolina Sub-Class to refrain from unfair and deceptive practices under the UDTPA and to disclose the AIS Defect. Defendants' unconscionable or deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the AIS Defect and its corresponding safety risk are substantially injurious to consumers. As a result of Defendants' knowing, intentional concealment, and/or omission of the AIS Defect and corresponding safety risk in violation of the UDTPA, Plaintiff and members of the North Carolina Sub-Class have suffered harm and/or continue to suffer harm by the threat of sudden and unexpected failure of the AIS system and/or actual damages in the amount of the cost to replace the AIS system and any other parts essential to its proper operation, and damages to be determined at trial. Owners and lessees of Class Vehicles also suffered an ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices in the course of their business.

169. Defendants' unlawful acts and practices occurred in the conduct of business activities and commerce.

170.   Defendants have knowingly and willfully engaged in the unfair and deceptive trade practices alleged herein. Further, Defendants unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed latent defect and corresponding safety risk.

171.   Defendants' unlawful acts and practices affect the public interest and present a continuing safety risk to Plaintiff and members of the North Carolina Sub-Class, as well as the public.

172.   As a direct and proximate result of Defendants' violations of the UDTPA, Plaintiff and members of the North Carolina Sub-Class have suffered actual financial loss, actual damages, and/or injury-in-fact.

173.   Plaintiff and members of the North Carolina Sub-Class seek actual damages and treble damages against Defendants in an amount to be determined at trial because Defendants acted wantonly or with such conscious indifference to the consequences that malice may be inferred.

174.   Plaintiff and members of the North Carolina Sub-Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, awarding costs and attorneys' fees and any other just and proper relief available under the UDTPA.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment against Defendants and in favor of Plaintiff and the Classes, and award the following relief:

- An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Classes, and Plaintiff's counsel as counsel for the Classes;

- An order awarding declaratory relief and enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged herein;

1

- • Appropriate injunctive and equitable relief;

2

- • A declaration that Defendants are financially responsible for all Class

3

  notice and the administration of Class relief;

4

- • An order awarding costs, restitution, disgorgement, punitive damages,

5

  statutory damages, treble damages, and exemplary damages under

6

  applicable law, and compensatory damages for economic loss, diminished

7

  value, and out-of-pocket costs in an amount to be determined at trial;

8

- • An order awarding any applicable statutory and civil penalties;

9

- • An order requiring Defendants to pay both pre- and post-judgment interest

10

  on any amounts awarded;

11

- • An award of costs, expenses, and attorneys' fees as permitted by law; and

12

- • Such other or further relief as the Court may deem appropriate, just, and

13

  equitable.

14

## IX.    DEMAND FOR JURY TRIAL

15

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by

16

jury of any and all issues in this action so triable of right.

17

18

DATED: January 9, 2023                    Respectfully submitted,

19

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**

20

*/s/ Jennifer L. Joost*

21

Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com

22

One Sansome Street, Suite 1850
San Francisco, CA 94104

23

Telephone: (415) 400-3000
Facsimile: (415) 400-3001

24

*Counsel for Plaintiff Deneen Nock and the
Proposed Classes*

25

26

27

28

45